UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

vs.                                                       DECISION AND ORDER
                                                              04-CR-6157 CJS

WILBERT JACKSON,

                         Defendant.
_____

APPEARANCES

For the Government:                          Bret Puscheck, A.U.S.A.
                                                          United States Attorney's Office
                                                          100 State Street, Room 620
                                                          Rochester, NY 14614

For the Defendant:                            Matthew Lembke, Esq.
                                                          Cerulli, Massare & Lembke
                                                          134 S. Fitzhugh Street
                                                          Rochester, NY 14606-2268


**INTRODUCTION**

The matter is currently before the Court on the defendant's application to suppress

tangible property allegedly recovered from him on August 16, 2004 and September 1,

2004, as well as his pre-trial identification by a confidential informant on August 25, 2004

and any in-court identification by the confidential informant. In regard to the outstanding

factual issues, the Court ordered a hearing, which was held on May 2, 2005. The Court,

now having had the opportunity to consider the testimony and exhibits, makes the following

findings of fact and conclusions of law, and in accordance with them, denies in all respects

the defendant's application to suppress the tangible property and identification testimony.

## FINDINGS OF FACT

Officer John Brennan has been employed with the City of Rochester Police Department for nineteen years. For the past fifteen years, he has been assigned to the Special Investigations Section ("SIS"). In the course of his duties with the SIS, he has received training relative to street sales of marijuana, cocaine, and other controlled substances. In that regard, he has attended several schools sponsored by the Rochester Police Department and the Drug Enforcement Administration. Further, in the course of his experience with the SIS, he has spoken with narcotics dealers about the manner in which narcotics are sold at the street level. This has involved hundred of interviews with individuals who were under arrest as well as confidential informants. Moreover, he has utilized confidential informants to make purchases of narcotics while he conducted surveillance of the transactions, and, acting in an undercover capacity, has made narcotics purchases himself. He has specifically been involved in the purchase of cocaine base at the street level over a hundred times. In Officer Brennan's experience, street sales could take anywhere from ten to thirty seconds time, during which cash would be exchanged for drugs. Such transactions could occur on a street corner or from a car, depending on the dealer.

As of August 16, 2004, pursuant to his duties with the SIS of the Rochester Police Department, Officer Brennan was participating in the investigation of drug trafficking in the Joseph Avenue/Dale Street area within the city of Rochester. In connection with that investigation, prior to August 16, 2004, at least three controlled purchases of narcotics had been made by confidential informants. Additionally, field investigation forms previously

compiled by the Rochester Police department were reviewed along with reports from informants and undercover officers who had made buys in the area. From an analysis of the information, law enforcement identified a strip in the Joseph Avenue/Dale Street area where a high concentration of street drug sales were being conducted, and initiated video surveillance to record activity. This strip included the area of 816 Joseph Avenue and Eiffel Place, where a majority of individuals, who were specifically under investigation, tended to congregate and sell narcotics. These individuals included the defendant, Wilbert Jackson, Brandon Pritchett, Nathaniel Doyle, and Skyler Fullilove, also known as "Warsey."

During the early afternoon of August 16, 2004, Officer Brennan, along with Special Agent Sean Martinek of the Bureau of Alcohol, Tobacco, and Firearms, was conducting surveillance in the area of 816 Joseph Avenue, at the point where the videotape recorder was set up. Officer Brennan observed  the defendant walk up and down the street, sometimes stopping directly in front of 816 Joseph Avenue. He also observed the defendant engage in what he believed, based upon his training and experience, were narcotics transactions. In that regard, Officer Brennan observed two occasions where the following occurred: an individual walked up to the defendant; an exchange between the two took place; the individual walked away from the defendant. In each case, the entire transaction took between ten to fifteen seconds. However, these two transactions were not videotaped, since the tapes had run out and there were no more blank tapes on site. Later that afternoon, though, at the request of Officer Brennan, Sergeant Tom Jansen, also of the Rochester Police Department, brought over more tapes, and a third transaction involving the defendant, which Officer Brennan observed, was in fact  recorded. This transaction occurred at about 6:10 P.M. (The recording of this transaction was received

into evidence as Exhibit #1.) Officer Brennan observed, at the corner of Joseph Avenue and Eiffel Place about two doors down from 816 Joseph Avenue, an individual on a bicycle wearing an Allen Iverson jersey with the number "3" on it and a red baseball cap follow the defendant, who was dressed in a white T-shirt and dark blue pants. The two proceeded down Eiffel Place, stopped at a telephone pole and turned around. At that point, the defendant reached into his waistband,  took an item in his right hand, while the individual on the bicycle looked down, and then walked away. The male black on the bicycle then peddled down Eiffel Place. This transaction took a matter of seconds and was consistent with the two transactions  involving the defendant which were  previously observed by Officer Brennan on August 16, 2004. Officer Brennan, based upon his training and experience, concluded that this was another drug transaction. Furthermore, this transaction was consistent in the manner in which confidential informants utilized by Officer Brennan had engaged in street sales of narcotics and was consistent with the high level of narcotics trafficking in the area.

After observing this third occurrence, Officer Brennan spoke to Sergeant Jansen and  alerted him to what he saw. Officer Brennan subsequently spoke to a uniformed officer, John DeMascio, and indicated to him that he had observed a drug transaction between the defendant and another individual, and told him to stop the defendant and completely search him. Officer DeMascio did as directed, stopped and searched the defendant, and discovered twenty-one bags of what he believed was crack cocaine.

On September 1, 2004, Officer Brennan was again conducting video surveillance in the area of 816 Joseph Avenue. At about 4:30 p.m. on that date, Officer Brennan observed and videotaped the defendant sitting on a chair in front of 816 Joseph Avenue.

(This videotape was received into evidence as Exhibit #2.) Officer Brennan observed that the defendant appeared to be counting items in his hands and looking up and down the street. Officer Brennan could also see in one of the defendant's hands a plastic bag, the type of which is used to package drugs. Officer Brennan then requested the assistance of a uniformed officer to detain the defendant. Pursuant to Officer Brennan's request, Sergeant McDonald requested Officer Andrew McKenzie to 816 Joseph Avenue, to identify the individual under surveillance, and see if he had any narcotics on him. Officer McKenzie traveled in his police vehicle northbound on Joseph Avenue and observed the defendant near 816 Joseph Avenue seated on a chair. As Officer McKenzie approached the defendant in his police vehicle and was about 15 to 20 feet away, he saw the defendant throw what appeared to be small baggies on the ground underneath his chair toward a fence behind him. Officer Brennan also observed the defendant discard something, which he could not identify at that time. Officer McKenzie, accompanied by Officer Gorlay, went up to the defendant and asked him to stand. The defendant did so, and Officer McKenzie was able to observe small plastic ziploc type baggies containing a white rock-like substance on the ground. Based upon Officer McKenzie's training and experience, he believed that the plastic baggies were consistent with packaging used in street level narcotics distribution and, in his opinion, the white rock-like substance was crack cocaine. After observing the items on the ground, Officer McKenzie searched the defendant, and then placed him in his police vehicle.  Officer McKenzie called Sergeant McDonald, and, after doing so, went over to recover the items he had seen the defendant throw on the ground. He specifically recovered three baggies containing what in his opinion was crack cocaine. Subsequently, he again spoke to Sergeant McDonald who advised Officer

McKenzie that it was believed that the defendant had a larger sandwich baggie of crack cocaine on his person and that Officer McKenzie should search the defendant again. Officer McKenzie had the defendant step out of his police vehicle and re-searched him. He didn't find anything on the defendant's person, but did find underneath the back seat in the police vehicle where the defendant had been placed a sandwich bag containing eight other bags of what appeared to be crack cocaine.

Sean Martinek has been employed as a special agent with the Bureau of Alcohol, Tobacco, and Firearms since September of 2001. As of August 25, 2004 he was participating in the investigation into a group of individuals called Murder Unit who were operating in the area of Joseph Avenue and Avenue D in the city of Rochester. On August 25, 2004, Special Agent Martinek was working in a plain clothes capacity with Sergeant Jansen, and, along with Sergeant Jansen, was investigating individuals who were selling drugs in the Joseph Avenue/Avenue D area. In that regard, Special Agent Martinek and Sergeant Jansen picked up a confidential informant, and instructed him to proceed to the area of Joseph Avenue and Avenue D as well as Eiffel Place and Dale Street for the purpose of attempting to purchase narcotics from any individual associated with Murder Unit or any other individual selling narcotics. Sergeant Jansen provided the confidential informant with funds, and Special Agent Martinek and Sergeant Jansen dropped the confidential informant at Remington Street and Avenue D, a location about a block from Joseph Avenue. Surveillance of the confidential informant was established and subsequently, about five to ten minutes after the confidential informant had been dropped off, he returned to Special Agent Martinek and Sergeant Jansen's vehicle. The confidential informant then turned over to Special Agent Martinek and Sergeant Jansen two dime bags

of what appeared to be crack cocaine, which the confidential informant had just purchased

from an individual who called himself Will. Special Agent Martinek and Sergeant Jansen

then proceeded to drive with the confidential informant down Joseph Avenue in an attempt

to identify the seller from whom the purchase had been made. Special Agent Martinek told

the confidential informant, "We're going to drive in a northbound direction on Joseph

Avenue.  I want you to  look on both the left and right side of the street on Joseph Avenue

and let me know if you see the individual who you just purchased the crack cocaine from

who  identified  himself  as  Will." As Special Agent Martinek, Sergeant Jansen, and the

confidential informant drove down Joseph Avenue they passed about 10 individuals, about

seven of whom were African American. In the area of 804 Joseph Avenue, the confidential

informant looked from the vehicle onto the east side of he street and stated, "That's Will

over  there."  From  the  time  that  the  confidential  informant  was  initially  dropped  on

Remington Street by Special Agent Martinek and Sergeant Jansen until the time he pointed

Will out at 804 Joseph Avenue about 25 minutes had elapsed.


**CONCLUSIONS OF LAW**

A.    Defendant's Application to Suppress Physical Evidence

The defendant has moved to suppress those items, as detailed in the Court's

Findings of Fact, that were recovered by the police on August 16, 2004 and September 1,

2004, based upon his contention that at the time the items were seized the police lacked

probable cause to arrest him. The Court disagrees.

As the Supreme Court has repeatedly explained, "probable cause is a fluid
concept--turning on the assessment of probabilities in particular factual
contexts." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d

527 (1983). Its focus is on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Thus, probable cause exists "where 'the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' " evidence of a crime will be found in the place to be searched. Id. at 175-76, 69 S.Ct. 1302 (quoting *457 *Carroll v. United States*, 267 U.S. at 162, 45 S.Ct. 280) (alterations in original); *accord United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990). The standard does not demand certainty but only a "fair probability" that contraband or evidence of a crime will be found. *Illinois v. Gates*, 462 U.S. at 238, 103 S.Ct. 2317; *accord United States v. Harwood*, 998 F.2d 91, 96 (2d Cir.1993). Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not. *See United States v. Price*, 599 F.2d 494, 501 (2d Cir.1979) (holding that circumstances must be viewed "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training" (internal quotation marks omitted)); see also 2 Wayne R. LaFave, Search and Seizure § 3.2(c), at 39 (3d ed. 1996) ("[A] trained and experienced officer will have probable cause in circumstances when the layman would not."); *cf. United States v. Colon*, 250 F.3d 130, 136-37 (2d Cir.2001)

*U.S. v. Gaskin*, 364 F.3d 438, 456-457 (2d Cir. 2004). As to probable cause, a law enforcement officer does not actually have to observe narcotics to possess probable cause for a drug arrest. *U.S. v. Perez*, 1997 WL 821768, 2 (D.Conn.,1997), citing *United States v. Tussa*, 816 F.2d 58, 62 (2d Cir.1987) (determining that probable cause existed based on a strange "series of meetings" and "behavior from which it could be concluded that [the defendants] were concerned about surveillance"). *United States v. Cruz*, 834 F.2d 47, 51 (2d Cir. 1987) (finding probable cause where DEA agents did not observe drugs). As *Gaskin* advises a police officer may use his experience, training and knowledge as a factor in determining that probable cause connecting a defendant with criminal activity exists. *Texas v. Brown*, 460 U.S. 730, 742-43, 103 S.Ct. 1535, 1543-44, 75 L.Ed.2d 502 (1983);

*See also U.S. v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) ("Given the agents' experience with drug transactions, their observation of a pattern of events that they reasonably recognized as common in drug deals, and the lack of plausible innocent explanations for the facts before them, we find that there was probable cause to arrest the defendants."). Moreover, the fact that a transaction occurred in an area known for its high incidence of drug trafficking is relevant in the probable cause analysis. *United States v. Ceballos*, 719 F.Supp. 119, 124 (E.D.N.Y. 1989)("the character of the area as a center of crime may enter into the reasonable suspicion calculus of a law enforcement officer.") *United States v. Espinosa*, 827 F.2d 604 (9th Cir.1987) (transfer of money halted upon sight of police in known drug trafficking area); *United States v. Green*, 670 F.2d 1148, 1152 (D.C.Cir.1981) ("geographic area is a valid consideration in the probable cause calculus"). Finally, the fact that a suspect is a known drug dealer or known to associate with drug dealers is a factor in determining whether probable cause exists. *United States v. Tramunti,* 513 F.2d 1087, 1101 (2d Cir.1975) ("Quite obviously knowledge that a suspect has been a narcotics dealer or offender or has consorted with a narcotics dealer may be one important element of probable cause")

    1.   <u>August 16, 2004</u>

    The Court will first turn its attention the defendant's application to suppress the twenty-one bags of suspected crack cocaine recovered from the defendant's person by Officer DeMascio on August 16, 2004. The Court specifically finds that at the time of the seizure of the bags, probable cause existed to arrest the defendant, and therefore such bags were validly seized as incident to a lawful arrest. In finding probable cause, the Court

relies on the following factors:

- As of August 16, 2004, Officer John Brennan had extensive experience in the area of narcotic trafficking and more specifically as to street level drug transaction.

- As of August 16, 2004, law enforcement had identified a strip in the Joseph Avenue/Dale Street area where a high concentration of street drug sales were being conducted, and this area included 816 Joseph Avenue and Eiffel Place

- The  Joseph Avenue/Dale Street area, including 816 Joseph Avenue and Eiffel Place, was  the location where a majority of individuals, who were specifically under investigation tended to congregate and sell narcotics. These individuals included the defendant, Wilbert Jackson, Brandon Pritchett, Nathaniel Doyle, and Skyler Fullilove, also known as "Warsey."

- While conducting surveillance during the early afternoon of August 16, 2004, Officer Brennan observed the defendant engage in what he believed, based upon his training and experience, were narcotics transactions. In that regard, Officer Brennan observed two occasions where the following occurred: an individual walked up to the defendant; an exchange between the two took place; the individual walked away from the defendant. In each case, the entire transaction took between ten to fifteen seconds.

- At about 6:10 P.M. Officer Brennan observed a third transaction involving the defendant and an individual on a bicycle, which was captured on videotape, in which the defendant reached into his waistband, then took an item in his right hand, while the individual on the bicycle looked down, and then walked away. The transaction took a matter of seconds. The transaction, in manner and duration, was consistent with the two involving the defendant previously observed by Officer Brennan on August 16, 2004.

- Based upon his training and experience, Officer Brennan concluded that this was another drug transaction, and further that it was consistent in the manner in which confidential informants utilized by Officer Brennan had engaged in street sales of narcotics and was consistent with the high level of narcotics trafficking in the area.

Based upon the area where Officer Brennan made his observations of the

defendant, *i.e.,* an area known to law enforcement as one where a high number of street drug sales occurred; based upon the pattern of activity on the part of the defendant observed by Officer Brennan; based upon Officer Brennan's expert opinion that the transactions, involving the defendant that he observed, were drug sales; and based upon the fact that the defendant was known to have previously engaged in drug sales, the Court concludes that such facts and circumstances, when viewed through the eyes of a trained and experienced police officer, such as Officer Brennan established probable cause to arrest the defendant.

      2.   <u>September 1, 2004</u>

As to the suspected crack cocaine and plastic bags recovered by Officer McKenzie on September 1, 2004, the Court also finds that these items were validly seized pursuant to a lawful arrest. By the time Officer McKenzie detained the defendant and searched him, Officer McKenzie had already observed the defendant discard items, which Officer McKenzie observed to be plastic bags containing what he recognized, based upon his training and experience, as crack cocaine. The Court, therefore concludes that based upon the facts and circumstances within Officer McKenzie's knowledge and based upon his expertise, probable cause existed to arrest the defendant on September 1, 2004 before any items were recovered.

B.   <u>Defendant's Application to Suppress Identification Testimony</u>

Defendant has also moved to suppress any testimony of his August 25, 2004 pretrial identification by the confidential informant, as well as in-court identification by the confidential informant.

The general principles governing challenges to pre-trial identifications are well established. A defendant has a due process right not to be the object of suggestive police identification procedures that create "a very substantial likelihood of irreparable misidentification." *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir.1992). *See United States v. Bautista*, 23 F.3d 726, 729 (2d Cir.1994) (identification excluded only where it is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law."). Based upon these well settled principles of law, the Court finds that the defendant has failed to establish the pre-trial identification procedure at issue here was in any way suggestive, let alone one that created a very substantial likelihood of irreparable misidentification.

As to the instructions given to the confidential informant by Special Agent Martinek, *i.e.*, "We're going to drive in a northbound direction on Joseph Avenue. I want you to look on both the left and right side of the street on Joseph Avenue and let me know if you see the individual who you just purchased the crack cocaine from who identified himself as Will," there was certainly nothing suggestive about them. As to the procedure itself, the Court looks to two New York State decisions which are on point, *People v. Clark*, 88 N.Y.2d 552, 556 (N.Y. 1996) and *People v. Banks*, 143 A.D.2d 677 (N.Y.A.D. 2nd Dept.,1988). In *Clark,* the New York Court of Appeals stated:

> Defendant was initially granted a Wade hearing to test whether any police suggestiveness tainted the victim's out-of-court identification of him on the street shortly after the crime had occurred. Testimony provided by a prosecution witness at the hearing established that the police-arranged procedure involved a police-car canvassing of the neighborhood near the crime scene with the victim seated in the back seat of the patrol car. In describing the procedure at length, the police witness specifically stated that he and his partner placed the complainant in their police car and drove the

complainant towards the area where he had been robbed, and that as they were driving the complainant yelled "There he goes" or "that's him." The officer stated that he then exited his car, stopped the person that the complainant had pointed to, waited for the complainant to exit the car and identify the individual stopped as the perpetrator, and then placed him under arrest. The defense extensively questioned the officer on this specific identification procedure to determine if it was tainted by any improper suggestion.

*People v. Clark* , 88 N.Y.2d at 556. In *Banks,* the New York State Appellate Division,

Second Department held:

> While two transit police detectives were driving the robbery victim through a neighborhood near the scene of the crime, the victim recognized the defendant standing in a group of men on a street corner and spontaneously identified him to the detectives. The complainant was removed from the area and the defendant was arrested. A short time later, the complainant viewed the defendant at Robbery Squad headquarters. This showup identification procedure confirmed that the proper person was incarcerated and was consistent with good police work (see, *People v. Morales*, 37 N.Y.2d 262, 271-272, 372 N.Y.S.2d 25, 333 N.E.2d 339; *People v. James*, 138 A.D.2d 744, 526 N.Y.S.2d 558; *People v. Brown*, 124 A.D.2d 812, 509 N.Y.S.2d 41, *lv. denied*, 69 N.Y.2d 877, 515 N.Y.S.2d 1024, 507 N.E.2d 1094). Therefore, the hearing court properly denied that branch of the defendant's omnibus motion which was for the suppression of identification testimony *(see*, *People v. Higgs*, 111 A.D.2d 410, 489 N.Y.S.2d 373).

*People v. Banks*,143 A.D.2d at 678.

Here the identification of the defendant by the confidential informant occurred within 25 minutes of his purported transaction with the defendant, and the identification occurred in an area of Joseph Avenue where about ten other individuals, including approximately seven African-Americans were located. Moreover, here unlike the situation in *Clark* and *Banks* (presumably because the investigation was ongoing) the observation of the defendant by the confidential informant in the vicinity of 804 Joseph Avenue was not followed by a show-up identification. In any event, as to the procedure employed, to borrow

the words of the *Banks,* the Court concludes that it , "was consistent with good police work," and certainly not unduly suggestive. Therefore, the defendant's application to suppress his pre-trial identification and any in-court identification by the confidential informant is denied.

## CONCLUSION

Accordingly, the defendant's application to suppress tangible property and identification testimony (#77) is denied.

IT IS SO ORDERED.

Dated:      May 13, 2005
            Rochester, NY                    ENTER.


                                   /s/ Charles J. Siragusa
                                   CHARLES J. SIRAGUSA
                                   United States District Judge